[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Liberty Plumbing Supply Company (hereinafter Liberty), and the defendant, Paul S. Yoney, Inc. (hereinafter Yoney, Inc.), did business for more than 25 years before this suit was commenced. Yoney, Inc. would issue purchase orders under that name, and the plaintiff would fill those orders and then bill Paul S. Yoney, Inc., which would then pay the bills with Paul S. Yoney, Inc. checks. That procedure never changed.
In the late 1980's, Yoney, Inc. became delinquent in its payments for the plaintiff's supplies, and as of August, 1993, that delinquency totaled $109,086 when this action for collection was commenced. Just prior to trial in 1994, the Yoney, Inc.'s counsel advised plaintiff's CT Page 10390 counsel that the original Paul S. Yoney, Inc. had been merged into Consolidated Equity Investors in 1983 and thereafter Consolidated did business as Paul S. Yoney, Inc. Defendant's counsel then suggested that the plaintiff amend its complaint to make Consolidated a defendant, which the plaintiff declined to do.
It would be helpful at this time to describe in more detail the corporate history of Yoney, Inc. before going any further. On or about April 12, 1983, a new corporation, Paul S. Yoney, Inc. of Delaware, was created in Delaware. Shortly thereafter the original Paul S. Yoney, Inc., the Connecticut corporation, was merged into its namesake in Delaware with the Delaware Yoney surviving and with its principal place of business at 679 Lindley Street, Bridgeport, Connecticut, the same address as before. At or about the same time, another Connecticut corporation, Edwin Moss Sons, Inc. was merged into a new Delaware corporation, Edwin Moss Sons, Inc. of Delaware with the Delaware corporation surviving. Thereafter, on April 21, 1983, Paul S. Yoney, Inc. of Delaware and Edwin Moss Sons, Inc. of Delaware were merged into another new Delaware Corporation called Consolidated Equity Investors, Inc. (hereinafter Consolidated), apparently for tax advantages available to Yoney. The surviving corporation was Consolidated Equity Investors with its principal place of business at 1200 Broad Street, Bridgeport, Connecticut.
The original officers of Yoney, Inc. in 1983 remained the officers of the Delaware Yoney and served in that same capacity for Consolidated. Consolidated apparently filed the necessary papers to do business in Connecticut and thereafter, on May 16, 1983, recreated a new Paul S. Yoney, Inc. in Connecticut (hereinafter Yoney, Inc.2). Gerald Yoney had been the President of the original Yoney, Inc., the President of Consolidated and the President of Yoney, Inc. 2. On July 1, 1983, he signed an agreement (third party claimant's exhibit 55) wherein Yoney, Inc. 2 assigned all of its interests in any assets, contracts, accounts receivable and choses in action to Consolidated and Consolidated agreed to transact all of the financial and administrative affairs of Yoney, Inc. 2. Yoney, Inc. 2, by that agreement, further assigned to Consolidated all of its right, title and interest in the use of its name, logos and trademarks. From that day forward, Consolidated did business as Paul S. Yoney, Inc. Yoney, Inc. 2 further agreed not to transact any business in its own name without the authorization, approval and ratification of Consolidated. By an assignment and authorization dated July 1, 1983 (third party claimant's exhibit 56) Consolidated did in fact authorize Yoney, Inc. 2 to act on its behalf, to enter into contracts for the purpose of conducting business in its own name as if acting for Consolidated. It is of interest to note that in said agreement Yoney, Inc. 2 acknowledged that it was engaged in the business of CT Page 10391 installing, fabricating, supplying and manufacturing heating, air conditioning and plumbing parts to the construction business, exactly what it had done since its inception until 1983 under Yoney, Inc.
All of this transpired without any knowledge of this new arrangement by the plaintiff or in fact anyone else who did business with Yoney, Inc. 2. The plaintiff continued to conduct business with Yoney as it had done for many years, using the same paperwork and procedures. Absolutely nothing changed. Consolidated never disclosed its existence to the plaintiff and never filed a fictitious trademark certificate as required under Connecticut General Statutes § 35-1.
As has been stated, just prior to the trial of this matter before an attorney trial referee, counsel for Yoney, Inc. or Yoney, Inc. 2 advised plaintiff's counsel for the first time that it really had been dealing with Consolidated since 1983 and not Yoney, Inc. Plaintiff's counsel was advised that Yoney, Inc. 2 did no business, had no assets, and showed no income on its federal or state income tax forms filed since 1983 and was described as an inactive corporation. Trial of this matter went forward on April 8, 1994. Yoney, Inc. maintained at all times that another entity, Consolidated, had ordered and was responsible for payment of the goods sold and delivered.
At the end of the case, the attorney trial referee allowed the plaintiff to amend its complaint by adding a CUTPA claim and then recommended a judgment on both the CUTPA count and a breach of contract count against Paul S. Yoney, Inc. An appeal was taken and eventually the Appellate Court held that the attorney trial referee had no authority to approve an amendment to the complaint adding the CUTPA count and remanded the case to the trial court.
The trial court ordered a new trial and an amended complaint was filed on February 4, 1997. The defendant Paul S. Yoney, Inc. accepted an offer of Judgment in the amount of $100,000 on March 3, 1997, and judgment was entered by the court on March 17, 1997.
During the pendency of the appeal, the court ordered the stay lifted and Liberty was granted the right to garnish certain accounts receivables (hereinafter Garnished Receivables), which it claimed belonged to Yoney, Inc., from Bridgeport Hospital and Merritt Construction as well as pursue other post judgment remedies. Yoney Realty, the third party claimant herein, claimed that it had a superior right to the Garnished Receivables pursuant to, inter alia, a security agreement and duly recorded UCC-1 financing statement between Consolidated as debtor and Yoney Realty as secured party. Accordingly, Yoney Realty then notified many, if not all, of the account debtors of Yoney, Inc. who were served with Liberty's CT Page 10392 garnishments of Yoney Realty's claim. Given the conflicting claims of Liberty and Yoney Realty, the account debtors withheld payment on the Garnished Receivables altogether.
In recognition of this stalemate, and while the appeal remained pending, Liberty and Yoney Realty negotiated a stipulation which provided for the Garnished Receivables to be released and substituted with a deposit account funded by Yoney Realty in the amount of $125,000 (hereinafter the 125 Account). The stipulation further provided that the priority of claims and disputes between Liberty and Yoney Realty as to the Garnished Receivables and any other garnishments and/or executions served by Liberty would be resolved in a proceeding to be commenced by Yoney Realty and Liberty under Connecticut General Statutes § 52-356c
(hereinafter 356c proceeding) after certain discovery was answered and/or taken. The 125 Account would then be awarded to the successful party in the 356c proceeding. The stipulation was presented to the court by Edward F. Kunin, Esq. on behalf of Liberty and was ordered granted on or about January 16, 1996.
The following provisions of the stipulation are particularly informative (underlining denotes emphasis added):
 WHEREAS, Yoney Realty claims an interest in the property and/or assets which are the subject of the garnishments and/or executions issued and obtained by Liberty incident to the PJR and the judgment in the Liberty case;
 WHEREAS, Yoney Realty and Liberty desire to reach an agreement regarding resolution of the priority claims and disputes by and between Liberty and Yoney Realty in and to the subject property and assets which are the subject of the aforesaid garnishments and/or executions issued and obtained by Liberty against Paul S. Yoney, Inc. in the Liberty case.
 NOW, THEREFORE, based on the mutual promises, covenants and consideration made, given and paid by the parties hereto, receipt of which is hereby acknowledged, the parties agree as follows:
1. Yoney Realty shall advance the sum of $125,000.00 to be held in a bank account in the name of "Edward F. Kunin and Pober, Ross Pasquini, Trustees" ("the 125 account") which 125 account shall be substituted as the property and monies CT Page 10393 subject to the garnishments and/or executions issued by and/or in the favor of Liberty, including any garnishments and/or executions served by Liberty, against various third parties in the Liberty case. The 125 account shall be held pursuant to the terms of this agreement until further order of the Court or agreement of the parties, whichever occurs first.
 2. Yoney Realty and Liberty expressly agree to institute a proceeding pursuant to Connecticut General Statutes § 52-356c ("the 356c proceeding") to determine the priority disputes incident to the property and assets previously garnished and/or executed against by Liberty against various third parties incident to the PJR and judgment obtained by Liberty against Paul S. Yoney, Inc. in the Liberty case.
 3. Yoney Realty hereby agrees to comply with Liberty's discovery requests dated October 2, 1995, attached hereto and marked "Exhibit A." Yoney Realty agrees not to institute the 356c proceeding until it has complied with said discovery request. The parties agree that the final hearing on the 356c proceeding will not occur until reasonable and adequate discovery has taken place.
 * * *
6. Upon the execution of this agreement, Liberty agrees to promptly and immediately execute and deliver to Yoney Realty written letters in form and substance similar to the notice attached hereto and marked "Exhibit B." Liberty further agrees that it shall not issue any further garnishments and/or executions in the Liberty case or take any further enforcement action concerning the judgment in the Liberty case. until a final determination of the 356c proceeding and any appeals therefrom. In the interim, Yoney Realty CT Page 10394 agrees the 125 account shall be expressly subject to the outstanding PJR, subject to the terms of this agreement.
The underlying lawsuit in this case began on September 21, 1993. The court has already described the history of the case that brings us to this point and will not repeat it unless necessary to explain a point. It is of interest to note that the Attorney Trial Referee and Judge Tobin, who approved her report, were entirely sympathetic to the plaintiff's case and each made strong statements throughout as to the methods and tactics of the defendant. They opined that if it was not its intention to defraud creditors, in fact that is what happened.
The quarrel now, however, is between Liberty and Yoney Realty, Inc. as to the 125 account. As has been stated, Yoney Realty's claim arises out of a factoring agreement it entered into on November 5, 1993, with Consolidated Equity Investors, Inc., a Delaware corporation which listed its then address as 679 Lindley Street in Bridgeport rather than 1200 Broad Street as previously stated (see third party claimant's exhibit 85). That address has been the principal place of business of all the Yoney plumbing business interests from the beginning. Yoney Realty owned the premises.
There was testimony that at least one of the reasons for this agreement was that Consolidated was encountering financial problems and it needed cash so it needed to sell its account receivables. Obviously, these account receivables were valid assets of Consolidated or Yoney, Inc. 2 and available to its creditors by legal process. Instead of getting cash for the sale of these receivables, Yoney Realty initially paid for them by a promissory note attached to exhibit 85. Gerald Yoney signed this agreement on behalf of Consolidated and his brother Robert signed as Vice President on behalf of Yoney Realty. Gerald was also the president of Yoney Realty. It is of interest to note that in paragraph 4 of that agreement the following language exists:
 "The parties hereto agree to keep the terms and conditions of this agreement confidential and not to disclose to any third party, or make use in any way the name and address of any CEI customer accounts transferred to Realty under the terms of this agreement.
Thus, any third party, such as the plaintiff, which did not even know who it was dealing with since 1983 would also never know that all account receivables were sold and would never be available to it. CT Page 10395
Thereafter, on April 4, 1994, Consolidated, as debtor, entered into a security agreement with Yoney Realty Corporation as Secured Party in the amount of $300,000 to secure the indebtedness pursuant to the terms of the factoring agreement of November 5, 1993 (see third party claimant's exhibit 108). In that security agreement, both parties were listed as being located at 679 Lindley Street in Bridgeport, the same address as Yoney, Inc. and Yoney, Inc. 2. That was followed by the filing of a Financing Statement with the Secretary of State on April 6, 1994, memorializing the factoring agreement. Thereafter, on April 4, 1994, by a series of documents, Consolidated did assign to Yoney Realty Corporation specific account receivables from Bridgeport Hospital, Merritt Construction, Henry Gerety, Inc., and S. B. E. Company (see exhibits 112-116).
Thereafter, on June 9, 1994 through October 12, 1994, an attorney on behalf of Paul S. Yoney, Inc. and Consolidated Equity Investors, Inc., Stuart Ratner, wrote to each of the entities owing money to Yoney (see exhibits 115 through 117) as follows:
 Please be advised that services and materials previously provided to or for the benefit of your firm and billed to you under the name Paul S. Yoney, Inc. has been improperly invoiced. In reality, Consolidated Equity Investors, Inc. (federal ID # 06-1084929) has performed all services and provided all materials previously billed to you under the Yoney name. No work has been performed nor any materials provided to or for the benefit of your firm by Paul S. Yoney, Inc. (federal ID # 06-0631376), which is an inactive Connecticut corporation.
In order to correct our clerical error, we enclose substitute original invoices, in the name of Consolidated Equity Investors, Inc., for all services and materials previously performed or provided to your firm which remain open and unpaid. Please substitute the enclosed invoices for those which have previously and erroneously been provided to you by Paul S. Yoney, Inc. Since all services and materials provided to or for the benefit of your firm have been provided to you by Consolidated Equity Investors, Inc., any payments which you may make to or for the benefit of Paul S. Yoney, Inc. are improper and gratuitous. Your outstanding liabilities are due to Consolidated Equity Investors, Inc. and any payments which you make to or for the benefit of Paul S. Yoney, Inc. will not be CT Page 10396 considered a payment against your account and, therefore, not reduce your outstanding obligation.
 We thank you in advance for your cooperation in this matter and regret any inconvenience that this clerical error may have caused you.
So now, for the first time in eleven years, Consolidated has disclosed its true identity and the fact that Paul S. Yoney, Inc. is only an "inactive" corporation and has done no business. To describe to account debtors of Yoney, Inc. that this was simply an eleven year "clerical error" borders on the ridiculous. Consolidated now executed documents so that Yoney, Inc. had nothing to satisfy its suppliers and creditors and all payments on accounts receivables due Yoney would now flow through Consolidated pursuant to its assignment to Yoney Realty and Gerald and Robert Yoney would end up with whatever was left to the exclusion of legitimate creditors and suppliers such as Liberty Plumbing.
The parties by their stipulation have now agreed to have at least the interests of Liberty Plumbing and Yoney Realty Corporation determined pursuant to the provisions of Connecticut General Statutes § 52-356(c). There is little law on this statute but what little there is gives the court some guidance on how it should go about its analysis of the respective claims. First, the section states that the court shall render judgment "determining the respective interests of the parties." That means to this court that it may utilize all of the evidence, and not just the date on documents. If time and date of the documents evidencing each party's claim were the only consideration, then there would be little need for a hearing at all. That position is bolstered by the cases of Simkov. Lamorte, 222 Conn. 793, 798 (1992) and In Re Allen-Main AssociatesLimited Partnership, 233 Bankruptcy Reporter 632 at 635 which confirm the "equitable nature of the statutory proceeding" making reference to §52-356(c).
Liberty's position is that Yoney Realty should not gain priority over a valid judgment creditor because of a series of unfair trade practices committed by it or other corporations that it has a unity of interest with and which purpose was to defraud creditors. There is no question that since 1979 Gerald Yoney was the president of Yoney, Inc. 1, Yoney, Inc. 2, Yoney Realty and Consolidated. His brother, Robert, was the Vice President or other officer of all four corporations. The court finds there was a unity of interest between these four entities.
Connecticut courts, when determining whether a practice violates CUTPA, consider (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as established by CT Page 10397 statutes, the common law or otherwise — whether it is within the penumbra of some statutory or other established concept of unfairness; (2) whether the practice is immoral, unethical, oppressive or unscrupulous and whether it causes substantial injury to consumer or competitors or other businesses.
The first unlawful trade practice alleged against Consolidated is that it did not comply with Connecticut General Statutes § 35-1, which required it to register in the name of Paul S. Yoney, Inc. "One purpose of such statute is to protect the public in general and creditors in particular from fraud. . . . Harved Realty v. Deboral Leekoff, et al, 1998 WL 231221 (Conn.Super.) It is admitted that Consolidated never complied with that section over a ten year period. Thus, there was no way that the true identity of Consolidated was ever available to Liberty. Everything Consolidated did, including the factoring agreement of November 5, 1993, was designed to prevent anyone including creditors from ever learning of its existence or that it was operating as Paul S. Yoney. Section 35-1
categorically states that a failure to comply with it is an unfair trade practice. Rather than voiding a transaction, § 35-1 declares it to be an unfair trade practice thus subjecting its violator to even greater sanctions than if the transaction were void. Headquarters Company v.Michael Silverstein, et al, 1990 WL 274510 (Conn.Super.) In this equitable proceeding, it is clear that Liberty is saying that had there been compliance, it might very well have discussed Consolidated's true existence and then chosen a different method of dealing with Consolidated or Yoney to protect itself. This Liberty was deprived of. The absence of filing clearing could have affected this creditor, Liberty, and in this equitable proceeding this court, cannot ignore the additional sanction of a CUTPA violation in determining the relative rights of these parties.
In its brief at page 8, Yoney Realty claims that even if there is a sustainable action under CUTPA, it would have to be presented as such and "not asserted through the back door of a proceeding under C.G.S. §52-356c." Yoney is the party that has chosen this statutory proceeding and put up the 125 fund to avoid Liberty's efforts to collect on its judgment. As an equitable matter, this court can consider any evidence to establish the relative interests of the parties. To the claim that this CUTPA violation is only against Consolidated and not Yoney Realty, the court is not unmindful that Consolidated, Yoney, Inc. 1 and 2 and Yoney Realty are all closely held corporations controlled by the brothers Yoney, and they have done everything in their power including contracting with each other for a non-disclosure of their corporate identities.
Yoney's attorney also claims that failure to file a trade name certificate does not void contracts by the non-compliant entity and citesSagal v. Fylar, 80 Conn. 293, a 1915 case, for that proposition. At that CT Page 10398 time, only a criminal penalty was contained in the law for a violation OF § 35-1. Since 1983, when the legislature added the language that non-compliance amounts to a "per se" CUTPA violation, the rules have changed. This court is not ruling that Consolidated, as a non-complying entity, would have no access to the courts to enforce a right it had by contract. What the court is saying is that in an equitable proceeding such as this non-compliance is a factor to be utilized in determining the relative interests of a lawful creditor and an entity which seeks priority through a series of questionable documents.
The third party claimant further argues that Consolidated's inadvertent failure to comply with § 35-1 could not render their assignment of account receivables to Yoney Realty void. The problem with that argument is its characterization of the failure as "inadvertent." That is about as disingenuous as Attorney Ratner in exhibit 115 describing the mistake in billing by Paul Yoney, Inc. rather than Consolidated for ten years as a "clerical error." And, finally, any fair reading of the secrecy clause in the factoring agreement itself (exhibit 85) leaves little doubt as to what the Yoney's were doing. The attorney trial referee was not fooled, Judge Tobin was not fooled and neither will this court be fooled.
Liberty's second claim of an unfair trade practice is that Consolidated either violated the now repealed Connecticut General Statute § 33-398(b) or its successor Connecticut General Statute § 33-925(b). The court will not determine which of these statutes applies here but it certainly can be argued that Consolidated violated both. Again, Yoney Realty argues that a violation of either would not render Consolidated or Yoney Inc. 2's contracts void. The court does not disagree, but that does not mean that whatever took place or did not take place cannot be used in determining the relative rights of the two entities that are claiming the 125 fund.
Liberty's final claim is that the totality of the arrangement permitted a corporate shell game. Yoney Realty counters that "Liberty's charge of a corporate shell game is inaccurate and unavailing. Yoney argues that the facts found by the attorney trial referee have no legal effect here because her findings which were incorporated into a judgment were reversed by the Appellate Court in Liberty Plumbing Supply Co. v. PaulS. Yoney, Inc., 41 Conn. App. 594 (1996). While that is technically correct, the only issue the Appellate Court entertained was the power of the attorney trial referee to amend the complaint in a case presented to her. This the court said she could not do. It in no way discussed, let alone found error, in her other conclusions, and the whole issue between Liberty and Paul S. Yoney, Inc. was laid to rest by the acceptance of the plaintiff's $100,000 offer of judgment in the underlying case. CT Page 10399
This court has not reviewed the findings of the attorney trial referee and has made its determination of facts based on the testimony before it and the exhibits presented numbering over 125. The court is well aware that the third party claimant herein, Yoney Realty, was not a party to the underlying action, but that does not prevent this court from considering the machinations of the various Yoney corporations in deciding who equitably is entitled to the 125 fund.
The court will quote liberally from the memorandum of June 6, 2000 submitted by Liberty's attorney on page 8.
 "The clear purpose of Connecticut "s statutory scheme is to provide notice of encumbrances, names, and similar commercial information. If the statutes are not followed, no one, creditor or customer knows with whom it does business. If one checked the Secretary of State's office, one found Paul S. Yoney, Inc., an active Connecticut corporation. If one checked the UCC files one would not discover assignments of Paul S. Yoney, Inc.'s accounts receivable because the UCC-1 was filed in Consolidated's name. If one checked the fictitious trade name records, one would find nothing because nothing was filed. Liberty, who did business with PSY for years prior to the alleged corporate rearrangement had no way of discovering it was doing business with a different entity.
 The arrangement permits Yoney to have a chameleon-like quality. It can sue as Paul S. Yoney, Inc., the Connecticut corporation. Enter collective bargaining agreements as Paul S. Yoney, Inc., in other words choose the entity most advantageous to it with a particular party, at a particular point in time. Our statutory scheme requires the exact opposite. People are supposed to know with whom they deal and no one sheds corporate identities for their advantage and the disadvantage of others."
This court cannot disagree with that as a fair and accurate general statement and certainly it can be argued persuasively that that is precisely what took place here. No person on behalf of Yoney, Inc. 1, Yoney, Inc. 2, Yoney Realty or Consolidated ever disclosed to Liberty their true status. By all of their actions, the Yoney entities misled their trusted supplier here, Liberty, into thinking it was business as usual. Only when Liberty commenced the underlying lawsuit in late September of 1993 to collect $109,000, which it was legally entitled to, CT Page 10400 did Consolidated almost immediately assign out its or Yoney, Inc. "s account receivables to shelter them from creditors and keep them all in house. If this is truly an equitable action, then all the equities lie with Liberty. Therefore, the court finds, based on all the facts, that Liberty has a superior right than Yoney Realty to the 125 account and finds for Liberty in the amount of $100,000 representing the accepted offer of judgment in the underlying case with interest from March 17, 1997 at the rate of 10 percent. As the interest exceeds the balance in the 125 account after the deduction of $100,000, the court orders that the entire amount of $125,000 be awarded to Liberty.
GORMLEY, J.